UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | Criminal No. 09-20-GFVT |
| v. | ) | |
| ADAM OLIVERI, | ) | **MEMORANDUM OPINION** |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The Court issues this opinion to supplement its oral ruling at trial denying the defendant's request to include self-defense and justification instructions in its charge to the jury. For the reasons previously stated and that follow, the evidence, even construed in the defendant's favor, did not support the requested instructions.

**I.**

**A.**

At the outset, the Court notes the posture of the case at the time of its decision. The defendant, Adam Oliveri, stood trial for assault of a corrections officer in violation of 18 U.S.C. § 111(a)(1) and (b), the sole count in the indictment. [*See* R. 1.] Before the presentation of evidence, the Court advised counsel for both parties that it intended to hold a charge conference to finalize the jury instructions towards the end of the presentation of evidence. [Trial Tr. Vol. I, R. 90 at 21.] During his opening statement, counsel for the defendant told the jury that his client did not deny assaulting the corrections officer in question. [*Id.* at 30.] Instead, he told them that Oliveri's defense rested entirely on the affirmative defenses of justification and self-defense. [*Id.*]

The next morning, and prior to calling its first witness, the United States announced to the defendant and the Court that it intended to oppose the defendant's request to instruct the jury on both defenses. [Trial Tr. Vol. II, R. 91 at 4.] In response, the Court noted that the burden for obtaining a defense instruction is light but advised the parties that it would consider their arguments based on how the evidence unfolded. [*Id*. at 5-6.]

At the conclusion of the second day of trial, the Court gave the parties proposed jury instructions for their consideration. [*Id*. at 295-96.] When trial resumed the next day, the Court again touched upon the subject of defense instructions. Specifically, at a bench conference in the midst of the defendant's proof, the Court noted that it was still an open question whether the evidence supported a self-defense instruction. [Trial Tr. Vol. III, R. 92 at 70.] Nevertheless, the Court reserved making any ruling until all the evidence was in. [*See id.*]

After the presentation of the evidence, the Court held the charge conference and the defendant formally requested the inclusion of justification and self-defense instructions. [*Id*. at 113.] After hearing argument from both parties, the Court announced that it found insufficient evidence to warrant either instruction and therefore denied the defendant's motion. [*Id*. at 137-39.] *See* FED. R. CRIM. P. 30(b) ("The court must inform the parties before closing arguments how it intends to rule on the requested instructions.") In light of the Court's ruling, counsel for the defendant elected against making a closing statement to the jury. [*Id*. at 150, 157.] The Court accordingly informed the jury of this decision and advised them that closing arguments are not evidence and there is no requirement that a closing statement be given. [*Id*. at 157.] It then instructed the jury and released it to commence deliberations. [*Id*. at 160.]

During their deliberations, the jury sent a note seeking clarification of whether they were

to determine if the defendant assaulted the corrections officer or if it could determine that he acted in self-defense. [*Id*. at 161.] The Court solicited advice from counsel for the United States and the defendant, who agreed that the jury ought to be reminded of their obligation to follow the law, about which the Court had already instructed them. [*Id*. at 161-62.] Based on these consultations, the Court responded to the jury's request in writing, stating it was their duty to apply the law as already instructed to the facts as they determined them and that no supplemental instruction was appropriate at the time. [*Id*. at 163.] A short time later, the jury returned a verdict of guilty. [*Id*. at 164-65.]

**B**.

For the purpose of deciding whether to instruct the jury on Oliveri's affirmative defenses, the Court presents the evidence in a light most favorable to the defendant. *See United States v. Charmley*, 764 F.2d 675, 676 (9th Cir. 1985). Accordingly, at trial, the evidence showed that the defendant was an inmate incarcerated in the A-1 housing unit at United States Penitentiary Big Sandy in Martin County, Kentucky, in October 2008 and some months preceding. As pertinent here, the A-1 unit contains two tiers or floors. The ground floor contains an open area and provides ingress and egress to other parts of the facility, including the inmate dining hall. It also includes a microwave station that inmates may use to prepare food. A stair case near the exit leads to cells on the second tier, including the defendant's. Several surveillance cameras monitor the activity within the unit. At the time, Brian Adkins was one of the corrections officers assigned to the A-1 unit.

Oliveri, who is from New York, apparently associated, largely but not exclusively, with

inmates from the Northeast. Several of them testified that Officer Adkins singled out this group, and Oliveri in particular, for harassment. In their view, Adkins regularly subjected them to groundless searches for weapons, alcohol and other contraband. [R. 91 at 257; R. 92 at 5, 14, 47.] He is also said to have treated them in a derisive and degrading manner. [R. 91 at 220; R. 92 at 78.] Some of the inmates, including the defendant, attributed such alleged mistreatment to Officer Adkins's dislike of the inmates' Northeastern backgrounds. [R. 92 at 47, 78.]

The friction between Officer Adkins and the inmates reached its zenith in October of 2008. The triggering event occurred on October 15. On that night, as Oliveri and others were watching television on the second floor, Officer Adkins accused the whole group of being intoxicated and ordered them to return to their cells to be locked up. [R. 91 at 223-24; R. 92 at 15-16.] The inmates vigorously protested and, at Oliveri's urging, requested to speak with Adkins's supervisor, a lieutenant. [R. 92 at 17, 80.] The lieutenant who responded administered breathalysers to the group and found that the inmates had not been drinking. [R. 91 at 225; R. 92 at 17-18.] Accordingly, he ordered Adkins to apologize to Oliveri and the rest, but apparently none was ever offered. [R. 91 at 225, 258.] Several of the inmates testified that Adkins was angry at these turn of events. [R. 91 at 226, 259; R. 92 at 19, 50.]

Oliveri and other inmates believe that their vindication led to retribution the next morning. At some point in the morning, the defendant and others on the second floor were removed from their cells and told to wait in the yard. [R. 91 at 228, 231.] In the interim several officers searched their cells for contraband. It appears, however, that Officer Adkins was not on duty at the time and no evidence was presented that he participated in the search. [R. 91 at 101.] When the inmates returned to their cells a few hours later, they discovered them in a state of total

disarray. It appeared to the inmates, however, that Oliver's cell had been left in the worst condition. [R. 91 at 232.] They described how his pictures had been torn up and scattered about the cell, water had been spilled, a religious shrine had been turned upside down, and other property, including his mattress, had been dumped into the hallway. [R. 91 at 231; R. 92 at 52, 80.]

Again, the inmates protested. As they proceeded to lunch that afternoon, Oliver and co-inmate Stephen Burke approached the warden to complain about the search. [R. 91 at 233.] After hearing their story, the warden accompanied the inmates back to their cells to observe the mess. [*Id*. at 234.] Ultimately, the warden ordered the officers responsible to clean the inmates' cells. [*Id*.] The officers reportedly were unhappy by this decision. [R. 92 at 54.]

Although several days passed without further incident, it appears that these events culminated in a confrontation on October 21. According to the inmates, Officer Adkins approached the defendant as he and others were returning from the dining hall, sometime between 5 and 6:30 that evening. [R. 92 at 84-87.] The defendant testified that Adkins angrily said in front of the group, "Hey Oliveri. I heard you went crying – I heard you went ratting to the warden, crying like a little bitch over your pictures." [*Id*. at 84.] Other inmates recounted a substantially similar encounter. [*See* R. 91 at 236, 265; R. 92 at 55.] Oliveri and other inmates testified that calling a prisoner a "rat" is a direct threat to that inmate. [R. 91 at 237; R. 92 at 84.]

A second confrontation occurred later that evening. At some point between 7:00 and 8:30 p.m., Adkins is said to have encountered Oliveri and another inmate, Thomas Davis, on the first floor and told them, "I'm coming to see you when the doors are locked and that piece of shit Davis." [R. 92 at 89.] Oliveri believed that Adkins was threatening to take him from his cell

5

after the evening lock down – which typically occurred at 9:30 p.m. – and harm him. [R. 91 at 59, R. 92 at 89.] Oliveri, who was described as being very worried by this encounter, returned to the second floor of the housing unit to discuss the matter with some fellow inmates. [R. 92 at 91.] As a result of these discussions, Oliveri considered reporting Adkins's statements to a lieutenant. [*Id.*]

A few minutes later, on the ground floor, Adkins observed signs that Davis might be intoxicated and told him to report to the lieutenant's office. [R. 91 at 82-83, 110-11, 262-63.] Davis did not immediately comply with this order. Instead, he backed away from the officer and headed towards the microwave station where he had prepared food for the evening lock-up. [*Id.* at 262-63.] As he was doing so, he told the officers that he wished to retrieve his meal before reporting to the lieutenant's office. [*Id.* at 263-64.] The officers followed Davis and restated their orders, but Davis again protested. The officers then attempted to subdue Davis through force. In the course of doing so, a call for assistance issued to other prison personnel. As seen on the prison surveillance video, several officers and staff responded and assisted in restraining Davis. [Government's Exhibit 1.] Davis eventually fell to the ground, breaking his right wrist in the process. [*Id.*; R. 91 at 268.]

From the second tier, while discussing the threats with other inmates, Oliveri observed Davis backing away from the officers and getting "slammed" to the floor. [R. 92. at 92.] He concluded that the corrections officer had begun to carry out Adkins's threats and that he was next. [*Id.*] Seeing these events unfold, Oliveri testified that he "snapped." [*Id.* at 94.]

At this time, while several officers were restraining Davis, Officer Adkins headed toward the ground floor exit to secure the housing unit. [*See* Government's Exhibit 1; R. 91 at 83.] As

6

he was doing so, Oliveri rushed down the stairs and assaulted Adkins, striking him several times with a plastic ink pen. [*See* Government's Exhibit 1; R. 92 at 95, 97.] He testified that he took this course of action to prevent Adkins from harming him. [*Id*. at 96.] He further testified that, under the circumstances, he was unable to report Adkins's threats to the warden or other prison official. [*Id*. at 98.] During the assault, the ink pen broke, and Oliveri ran back up the stairs to the second floor cells and flushed it down a toilet. [*Id*. at 97-98; *see* Government's Exhibit 1.]

As a result of these events, Officer Adkins received multiple lacerations to his head, arms and back. [R. 91 at 204.] He was taken to the hospital and was treated with staples and stitches and did not return to work for two weeks. [*Id*. at 87.] Oliveri was identified as the attacker and taken into custody a short time later. [*Id*. at 24-26.]

## II.

The Court considered the defendant's request for justification and self-defense instructions in light of the foregoing. Both parties agreed that a defendant is entitled to an instruction on a recognized affirmative defense "whenever there is sufficient evidence from which a reasonable jury could find for him on the issue." *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2004) (citing *Matthews v. United States*, 485 U.S. 58, 63-64, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988)). The precedents of this circuit instruct that this is not a heavy burden for the defendant. *United States v. Johnson*, 416 F.3d. 464, 467 (6th Cir. 2005) (citation omitted). Indeed, it has been said that although an instruction need not be given "if it lacks evidentiary support or is based on mere suspicion or speculation, so long as there is even weak supporting evidence" the defendant has met his burden. *United States v. Newcomb*, 6 F.3d 1129, 1132 (6th

Cir. 1993) (internal citations and quotations omitted). Nevertheless, the Court thinks it is self-evident that for this standard to have any meaning it must raise more than just a nominal obstacle for the defendant to overcome. Moreover, a defendant must produce sufficient evidence of each element of the affirmative defense before the jury will be instructed on it. *United States v. Milligan*, 17 F.3d 177, 182 (6th Cir. 1994).

Self-defense and justification are similar defenses in that they will not excuse otherwise criminal conduct unless the defendant acted under the shadow of an imminent threat.[1] Justification differs from self-defense, however, in that it involves four other elements. More particularly, the defendant must show that (1) he did not recklessly or negligently place himself in a situation in which it was probable that he would be forced to choose criminal conduct; (2) he had no reasonable, legal alternative to violating the law; (3) he reasonably believed that the criminal conduct would avoid the threatened harm; and (4) that he did not maintain the criminal conduct any longer than absolutely necessary. *Newcomb*, 6 F.3d at 1134; *Sixth Circuit Pattern Jury Instruction 6.07*.

Self-defense and justification also involve different burdens of persuasion. In the case of the former, the government must prove beyond a reasonable doubt that the defendant did not act in self-defense. *United States v. Lewis*, 363 Fed.Appx. 382, 393 (6th Cir.2010); *Sixth Circuit Pattern Jury Instruction 6.06*. In practical terms, this means that the government must prove that

---

[1] In the context of self-defense, a person is entitled to use force against the immediate use of unlawful force. *See United States v. Guyon*, 717 F.2d 1536, 1541 (6th Cir. 1983); *Sixth Circuit Pattern Instruction 6.06*. For justification to excuse criminal conduct, the defendant must show that he reasonably believed he was under a present, imminent and impending threat of death or serious bodily injury to himself or to others. *United States v. Newcomb*, 6 F.3d 1129, 1134 (6th Cir. 1993); *Sixth Circuit Pattern Jury Instruction 6.07*.

it was not reasonable for the defendant to think that force was necessary to defend against an imminent threat. *Sixth Circuit Pattern Jury Instruction 6.06.* By contrast, the defendant bears the burden of proving each element of justification by a preponderance of the evidence. *United States v. Kemp*, 546 F.3d 759, 765 (6th Cir. 2008); *Sixth Circuit Pattern Jury Instruction 6.07.* Of course, as stated above, for a defendant to be entitled to an instruction, he must only show sufficient evidence that would allow a reasonable jury to find in his favor.

Viewing the facts favorably to the defendant, the Court sees no evidence that Oliveri was – or could reasonably believe he was – under an imminent threat. In making this determination, the Court accepts as true the defendant's contention that the statements Officer Adkins made to him and inmate Davis were direct threats. Even so, Officer Adkins indicated that he would not act on those threats until after the inmates had been locked-in for the night, some 30 to 40 minutes hence. This circuit has observed that the term "imminent threat" in a prison context should be construed narrowly. *United States v. Howe*, 289 Fed.Appx. 74, 78, 2008 WL 3820487 (6th Cir. 2008)[2] (citing *United States v. Sahakian*, 453 F.3d 905, 909 (7th Cir. 2006)). Threats that are to materialize in the future ordinarily do not rise to the required level of immediacy. *See Howe*, 289 Fed.Appx. at 79 (threat by co-inmate to crack defendant's head open not imminent

---

[2] *Howe* and several of the cases that follow concerned an inmate's claims that he resorted to criminal conduct out of coercion or duress. *See Howe*, 289 Fed.Appx. at 77. The Court, however, sees no material difference in the immediate threat requirements for self-defense, justification, and duress. As the Sixth Circuit has observed, self-defense is an example of justification, *i.e.*, a "category of action that is exactly the action that society thinks the actor should have taken, under the circumstances." *Newcomb*, 6 F.3d at 1133. Moreover, although justification and duress differ in important regards, *see id.* at 1133, they are materially similar in their elements, *see Sixth Circuit Pattern Jury Instructions 6.05, 6.07*, arise in "rare situations" and are to be construed narrowly, *Howe*, 289 Fed.Appx. at 77 (duress); *United States v. Kemp*, 546 F.3d 759, 765 (6th Cir. 2008) (justification).

where there had been a cooling-off period between the threat and the assault) (citing *United States v. Bello*, 194 F.3d 18, 21 (1st Cir. 1999) (self-defense instruction not warranted because threat not imminent); *United States v. Tokash*, 282 F.3d 962, 970 (7th Cir. 2002) ("We have noted in the past that 'future' or 'later' and 'imminent' are opposites"); *United States v. Haynes*, 143 F.3d 1089, 1090 (threat of action later that afternoon not imminent). This is so because a threat to harm in the future may not in fact happen and usually presents an opportunity to avoid the harm and the criminal conduct. *Haynes*, 143 F.3d at 1091. In the situation confronting Oliveri, the fact that harm would not befall him for some thirty or more minutes presented ample opportunity for the defendant pursue a lawful course of conduct such that Officer Adkins's threats were not imminent.

Nor did the use of force against inmate Davis transform the future threat against the defendant into an immediate one. For one thing, that incident occurred on the first floor after Oliveri relocated to the second floor. He was therefore in no danger of being harmed by the melee below.³ The Court also cannot ignore the prison surveillance footage of the incident, which removes any doubt about the immediacy of the threat. [*See* Government's Exhibit 1.] It confirms that no prison official – including Officer Adkins – made any move against Oliveri from which he could reasonably conceive as the execution of Adkins's threats. [*See id.*] Instead, the opposite is true: to put himself in striking distance of Officer Adkins, Oliveri had to rush *down* the stairs while Adkins approached the unit's first floor exit. [*Id.*] For his part, Officer Adkins showed no interest in the defendant until he sensed Oliveri running down the stairs. [*See*

---

³ Although the justification defense may excuse a defendant for conduct undertaken to protect a third person from death or serious bodily injury, Oliveri did not argue that he assaulted Officer Adkins to aid inmate Davis.

*id.*] Under these circumstances, no jury could find there to be reasonable grounds for believing the threat against the defendant was imminent.

Furthermore, Oliveri's testimony demonstrates the irrationality of basing his fear on the forcible restraint of inmate Davis. On direct examination, the defendant stated that he did not witness the entire incident between inmate Davis and the facility staff. [*See* R. 92 at 92-93.] For instance, he did not see the corrections officers direct Davis to report to the lieutenant's office on suspicion of intoxication. [*Id.*] Instead, Oliveri became aware of the altercation only after Davis had begun to back away from the officers.[4] [*Id..*] By his own admission, therefore, the defendant

---

[4] On this point, Oliveri testified as follows:

A. Did I call the lieutenant? No, I had just gone up the stairs, and a couple of guys had mentioned that maybe that's what you should do.

Q. And why didn't you?

A. Because while I was talking on the top range -- I mean, you see the video -- I looked down, and there's Davis backing up, and I see four CO's just body slam him to the floor. I mean . . .

. . .

[PLAYING VIDEOTAPE]

. . .

Q. Okay. Just pause it right there. Adam, now, were you able to witness what's happening here or was that already going on before you saw what was taking place downstairs?

A. Right. I didn't -- I didn't see the initial --

Q. You didn't see Davis being called up front?

A. No.

MR. COFFEY: Okay. Play on.

[PLAYING VIDEOTAPE]

Q. Okay. Pause it there. All right. Now, Davis is walking backwards, and those officers are starting to come towards him. Did you see any of that?

A. Maybe a little bit further.

MR. COFFEY: Okay. Play on.

missed the crucial context surrounding the events unfolding below him that would have allowed him to make a reasonable evaluation of the situation. Instead, he jumped to the conclusion that the officers were attacking Davis and would come for him next. Since no evidence established there was an immediate threat – or even a reasonable belief of an immediate threat – neither a self-defense nor a justification instruction was warranted.

Relatedly, the Court declined to give a justification defense because the defendant failed to meet his burden with regard to two other elements. The first was that Oliveri had not recklessly or negligently placed himself in a situation where assaulting Officer Adkins was necessary. Even assuming the existence of a threat, the evidence showed that the defendant initiated the assault on Officer Adkins and did so based on the confrontation with inmate Davis, an event that Oliveri, because of his admissions, could not have fully understood. Moreover, in important aspects, this case resembles *United States v. Lewis*, 363 Fed.Appx. 382, 393 (6th Cir. 2010), where the Sixth Circuit found that a prisoner under an imminent threat from another inmate nevertheless was not entitled to a justification instruction because he initiated the attack and sought out and pursued his opponent. The court therefore found that no reasonable jury would find that the inmate had not recklessly or negligently placed himself in that situation. *Id.* The video surveillance of the A-1 unit shows that the same is true here. [*See* Government's

---

    [PLAYING VIDEOTAPE]
    A.    Probably about there.
    Q.    So you're starting to see it at this point?
    A.    Yeah, coming to the back of the unit.

[R. 92 at 92-93.]

Exhibit 1.]

Finally, although touched upon above, the Court reiterates that there was insufficient evidence for the jury to find that the defendant had no reasonable and legal alternative to assaulting Officer Adkins. Ordinarily, the failure to seize upon an opportunity to enlist the aid of law enforcement officials will defeat a justification defense. *See United States v. Gaviria*, 116 F.3d 1498, 1531 (D.C. Cir. 1997) (defendant cannot claim duress when he had, but passed up, an opportunity to seek the aid of law enforcement). Although the defendant testified that he had no choice in the matter [R. 92 at 77], the test is objective: whether reasonable alternatives to violating the law existed. *United States v. Harper*, 466 F.3d 634, 648 (8th Cir. 2008). In this case, the circumstances surrounding the events of October 21 indicate that the defendant had ample and reasonable alternatives to attacking Officer Adkins. The incidents of October 15 and 16 demonstrate that prison officials – including the warden – were receptive to, and swiftly addressed, inmate complaints of officer misconduct. Oliveri evidently recognized this because he testified that he considered reporting Officer Adkins's statements to a lieutenant before learning of the confrontation involving inmate Davis. Those sequence of events, however, did not foreclose this option. As discussed above, Oliveri was not under threat of an imminent attack. He therefore still could have sought protection from Adkins's superiors. He chose not to do so, preferring to take matters into his own hand. Under these circumstances, there is not even weak evidence showing that Oliveri was without reasonable alternatives to his chosen course of action.

**III.**

In sum, although the Court assumes that Officer Adkins twice threatened the defendant on October 21, no reasonable jury could conclude that the harm was imminent or that the defendant did not negligently place himself in the situation or lacked a reasonable alternative to assaulting him. Accordingly, the Court denied the defendant's motion to include a self-defense or justification instruction in its charge to the jury.

This the 16th day of July, 2010.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge